## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RANDALL DOUGLAS BROOKS,** | : | **CIVIL NO. 3:12-CV-2527** |
| | : | |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **WARDEN RICHARD SMITH,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM

Randall Douglas Brooks ("plaintiff"), an inmate formerly incarcerated at the Centre County Correctional Facility ("CCCF") initiated this civil rights action in the United States District Court for the Eastern District of Pennsylvania on August 12, 2012, naming as defendants Warden Richard Smith ("Smith"), Deputy Warden Jeffrey T. Hite ("Hite"), Lt. Jeanna Ananea ("Ananea"), C.O. Carlton Henry ("Henry"), and C.O. Juan Mendez ("Mendez"). (Doc. 3.) The matter was transferred from the Eastern District to this Court on December 18, 2012. Presently pending is defendants' motion (Doc. 8) to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the motion will be granted

### I.   Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief can be granted. FED. R. CIV. P.

12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept as true all [factual] allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007) (quoting Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005)). Although the court is generally limited in its review to the facts contained in the complaint, it "may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n. 2 (3d Cir. 1994); see also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

Federal notice and pleading rules require the complaint to provide "the defendant notice of what the . . . claim is and the grounds upon which it rests." Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint in the face of a Rule 12(b)(6) motion, the court must conduct a three-step inquiry.  See Santiago v. Warminster Twp., 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a claim should be separated; well-pleaded facts must be accepted as true, while mere legal conclusions may be disregarded.  Id.; see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009). Once the well-pleaded factual allegations have been isolated, the court must determine

2

whether they are sufficient to show a "plausible claim for relief." Iqbal, 556U.S. at 679

(citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 555 (requiring plaintiffs to allege

facts sufficient to "raise a right to relief above the speculative level"). A claim "has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S.

at 678.

## II.   **Allegations of the Complaint**

### A.   **February 5, 2012 Incident**

On or about January 30, 2012, plaintiff alleges that while he was housed at CCCF as a

pre-trial detainee on Administrative Custody (AC) status, defendant Henry placed him in a

cell with Inmate Ridley Chase Allison ("Inmate Allison"), who was on Disciplinary Custody

(DC) status because he had received misconduct reports for fighting.  (Doc. 3, at 11, ¶¶ 1-2.)

The following day, plaintiff asked L.T. Flasher if it was against regulations to place an

inmate on AC status in the same cell with an inmate on DC status.  (Id. at ¶ 4.)  L.T. Flasher

responded "Oh yeah its fine (AC) and (DC) are the same thing."  (Id.)

On February 5, 2012, his cellmate, Inmate Allison, became "unhinged" in that he

intentionally vomited in the cell, was violent, yelled and screamed, threw lunch trays, bared

his buttocks, and refused to "cuff-up," all in an effort to get removed from the cell he shared

with plaintiff.  (Doc. 3, at 12, ¶¶ 7-11.)  Corrections Officer Watson instructed plaintiff to

"cuff-up" so he could be removed from the cell.  (Id. at 12, ¶¶ 12-13.)  Defendant Ananea

3

responded "[n]o we can't take Brooks out of his cell with Allison in there." (Id. at 13, ¶ 14.) Watson obeyed the order. (Id.) The Correctional Emergency Response Team ("CERT") was on the scene about an hour later in full riot gear which included helmets, face shields, an electric shock shield, a battering ram, and padded uniforms.

Corrections Officer Billet ordered Brooks to "cuff up," but he was not removed from the cell based on the earlier order given by defendant Ananea. (Doc. 3, at 13-14, ¶¶ 12-16.) C.O Billet then instructed plaintiff to get under the bottom bunk. (Id. at ¶ 18.) "Instead of opening the cell door and charging Inmate Allison with the shock shield to cuff and shackle him to extract him from the cell, L.T. Ananea ordered them to discharge an entire can of (OC) spray into the cell, which they had turned off the ventilation in the cell, so that the (OC) spray could not dissipate. The CERT team then shut the food slot."[1] (Id. at 13, ¶ 19, 14, ¶ 20.)

Brooks, who suffers from asthma, experienced bronchial spasms, lack of oxygen, and a severe burning sensation. (Doc. 3, at 14, ¶¶ 22-23.) He was removed from the cell approximately eight to nine minutes after the OC spray was discharged. (Id. at 15, ¶¶ 23-24.) He was immediately seen by a nurse in the medical department and was instructed to get in the shower to remove the OC spray and to use the steam to clear his lungs of the OC spray. (Id. at 15, ¶ 26.) Thereafter, he was returned to a clean cell. (Id. at ¶ 28.) Later that same day, nurse Fromm allegedly refused plaintiff's request for either a breathing treatment or his

---

[1]"OC" spray is oleoresin capsicum, a pepper-spray equivalent.

4

inhaler. (Id. at ¶ 28.) Following this incident, he experienced nightmares and sought treatment from the "Psych doctor." (Id. at 16, ¶¶ 30-31.) He was prescribed medication to help him sleep. (Id. at ¶ 31.)

Brooks alleges that following the incident he wrote numerous request slips to defendant deputy warden Hite requesting to be moved from the Restricted Housing Unit "due to my pain and suffering caused by total negligence by L.T. Ananea." (Doc. 3, at 5.) None of his requests were answered.

**B.    June 30, 2012 Incident**

Plaintiff also alleges that on or about June 7, 2012, he filed a grievance concerning the failure of the "laundry trustee" to perform his job and complained about defendant Henry's refusal to rectify the situation. (Doc. 3, at 30.) On or about June 8, 2012, defendant Henry disclosed to all of B-1 block that plaintiff had filed the grievance. (Id.) "By C.O. Henry disclosing this information about the grievance, and that [he] filed it, this turned 85 percent of the B-1 Block against [him], and all the inmates started calling [him] a Rat Faced Snitch, and they would harass and intimidate [him] right in front of C.O. Henry, and C.O. Henry would let them get away with it because it was his way of retaliation, for [his] filing of the grievance." (Id.) He alleges that defendant Henry's conduct put him "in harms [sic] way." (Id.)

The harassment and intimidation from the other inmates escalated in the days that followed in that it sparked numerous arguments between plaintiff and disgruntled inmates.

5

(Doc. 3, at 31.)  On June 30, 2012, Defendant Mendez was made aware of the situation;
plaintiff informed him that "the disgruntled inmates were going to start a riot to get the whole
B-1 Block locked down" so as to prevent plaintiff from watching a NASCAR race that night.
(Id. at 31-32.)  Defendant Mendez witnessed the intimidation, harassment and taunting but
did nothing to punish the disgruntled inmates.  (Id. at 31.)  At approximately 7:00 on the
evening of June 30, 2012, plaintiff went to the laundry room for cleaning supplies.  (Id.)
Inmate Anthony Williams entered the laundry room after him and assaulted him by punching
him in the side of his face, side of the head, back of the head, spinal cord and vertebrae.  (Id.
at 32.)  He alleges that the assault was the direct result of defendant Henry's conduct in
disclosing that he filed a grievance.  (Id.)  He also alleges that defendant Mendez is also
responsible for the attack because he was aware that the other inmates were intimidating and
harassing him but took no remedial action.  (Id. at 32.)

He sustained a black eye, bruised vertebrae, various bruises on the side of his head,
face and neck, three chipped and bruised teeth and a severely bruised nose.  (Doc. 3, at 35,
¶¶(1)(a)-(4)(a).)  No treatment was given for the chipped and bruised teeth.  (Id. at ¶¶ 2(a),
3(a).  An x-ray of his nose revealed that it was not broken.  (Id. at ¶ 4(a).)  A physical
examination by a physician's assistant at CCCF found the cartilage in his nose to be
dislodged and blocking the right nostril.  (Id.)  An appointment was scheduled with an
outside specialist.  (Id.)  The outside specialist, Dr. Burwell, concluded that the cartilage was
not damaged, diagnosed him with allergies, and prescribed a nasal spray to reduce the

swelling.  (Id. at 38, ¶¶ 3-4.)

## III.   Discussion

Brooks alleges that defendants' conduct violated his Constitutional rights.  Section

1983 of Title 42 of the United States Code offers private citizens a cause of action for

violations of federal law by state officials.  See 42 U.S.C. § 1983.  The statute provides, in

pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d

1199, 1204 (3d Cir. 1996).  To state a claim under § 1983, a plaintiff must allege "the

violation of a right secured by the Constitution and laws of the United States, and must show

that the alleged deprivation was committed by a person acting under color of state law."

West v. Atkins, 487 U.S. 42, 48 (1988).

### A.   Defendants Smith and Hite

Defendants Smith and Hite argue that because they were not personally involved in

the allegedly unconstitutional conduct, the complaint against them is subject to dismissal.

(Doc. 8-2, at 12.)  Individual liability will be imposed under Section 1983 only if the state

actor played an "affirmative part" in the alleged misconduct.  See Evancho v. Fisher, 423

F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998)).  Liability "cannot be predicated solely on the operation of respondeat superior." Id. In other words, defendants in Section 1983 civil rights actions "must have personal involvement in the alleged wrongs . . . shown through allegations of personal direction or of actual knowledge and acquiescence." Atkinson v. Taylor, 316 F.3d 257, 271 (3d Cir. 2003); Rode, 845 F.2d at 1207-08. When a plaintiff merely hypothesizes that an individual defendant may have had knowledge of or personal involvement in the deprivation of his or her rights, individual liability will not follow. Atkinson, 316 F.3d at 271; Rode, 845 F.2d at 1207-08.

The complaint is completely devoid of any allegations against defendant Smith with regard to the February 5, 2012 incident. As to the June 30, 2012 incident, plaintiff attaches to his complaint a copy of an Inmate Request form dated July 7, 2012, bearing defendant Smith's response and signature. (Doc. 3, at 40.) Plaintiff alleges that defendant Hite failed to respond to requests slips that he filed after the February 5, 2012 incident, and failed to take corrective action after reviewing the grievance he submitted following the June 30, 2012 incident. (Id. at 5, 34, 36-37.) With respect to Hite's failure to respond to request slips and Hite and Smith's participation in the grievance procedure, a state prisoner's allegation that prison officials and administrators responded inappropriately, or failed to respond to, a prisoner's complaint or grievance, does not establish that the officials and administrators were involved in the underlying unconstitutional conduct. See Rode, 845 F.2d at 1207-08

(concluding that after-the-fact review of a grievance is insufficient to demonstrate the actual knowledge necessary to establish personal involvement); Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (same); see also Croom v. Wagner, 2006 U.S. Dist. LEXIS 64915, *4 (E.D. Pa. Sept. 11, 2006) (same); Ramos v. Pennsylvania Dept. of Corr., 2006 U.S. Dist. LEXIS 51582, *2 (M.D. Pa. July 27, 2006) (same).  Plaintiff allegations against defendants Smith and Hite are insufficient to establish that either defendant was personally involved in the alleged unconstitutional conduct that occurred on February 5, 2012 and June 30, 2012.

Plaintiff also attempts to impose liability on defendant Hite by arguing that his failure to respond to his requests concerning his ongoing serious medical needs for treatment constituted deliberate indifference. (Doc. 11, at 13-14.)  He is mistaken. It has clearly been held that a prison official cannot be considered deliberately indifferent simply because he or she failed to respond to medical complaints of a prisoner who is being treated by medical personnel.  See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir.1993).  There is no question that Brooks was under the care of medical personnel.  While he takes issue with the quality of care he received, he clearly acknowledges he was under treatment.  Accordingly, under Durmer, the claim against defendant Hite fails as a matter of law.

For the reasons set forth above, the complaint will be dismissed as to defendants Hite and Smith.

**B.    Excessive Use of Force**

Plaintiff alleges that on February 5, 2012, defendant Ananea used excessive force

when she ordered the CERT team to discharge an entire can of OC spray into the cell he and

his cellmate occupied.  Because he alleges that he was a pretrial detainee at the time of this

incident, his claim is properly brought under the Fourteenth Amendment, see Bell v. Wolfish,

441 U.S. 520, 535–539 (1979) (holding that the Due Process Clause of the Fourteenth

Amendment protects a pretrial detainee from the use of excessive force that amounts to

punishment), but analyzed under the same standard as an excessive use of force claim

brought under the Eighth Amendment.  Fuentes v. Wagner, 206 F.3d 335, 346–47 (3d Cir.

2000).  When considering an excessive use of force claim, a district court must consider

whether force was applied in a "good-faith effort to maintain or restore discipline, or

maliciously and sadistically" to cause harm.  Hudson v. McMillian, 503 U.S. 1, 6–7 (1992).

Courts look to several factors when making this determination, including:  (1) the need for

the application of force; (2) the relationship between the need and the amount of force that

was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff

and inmates, as reasonably perceived by prison officials; and (5) any efforts made to temper

the severity of a forceful response.  Id.;  See also Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir.

2000).

In considering the use of pepper spray, the Third Circuit recently stated the following:

As a result [of consideration of the above factors], use of tear gas is not "a *per se*
violation of the Eighth Amendment. . . ."  Soto v. Dickey, 744 F.2d 1260, 1270
(7th Cir. 1984).  Rather, "[t]he use of mace, tear gas or other chemical agent of the
like nature when reasonably necessary to prevent riots or escape or to subdue
recalcitrant prisoners does not constitute cruel and inhuman punishment."  Soto
v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984).  See also Michenfelder v.

Sumner, 860 F.2d 328, 336 (9th Cir. 1988) (policy allowing use of taser guns on inmate who refused to submit to a strip search does not constitute cruel and unusual punishment); Spain v. Procunier, 600 F.2d 189, 195 (9th Cir.1979) (the use of tear gas "in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required."); Clemmons v. Greggs, 509 F.2d 1338, 1340 (5th Cir. 1975) (the use of tear gas when reasonably necessary to subdue recalcitrant prisoners does not violate the Eighth Amendment).

Passmore v. Ianello, 528 F. App'x 144, 147-48 (3d Cir. 2013).  In Passmore, the inmate admitted that he refused to follow Corrections Officers' directives to take a shower pursuant to prison policy.  Moreover, before the corrections officer resorted to using the pepper spray, he warned Passmore, and gave him one more chance to comply.  Id.  Other Courts, including two within our district,  have also found that an isolated discrete use of pepper spray does not state a constitutional claim.  See, e.g., Luciano v. Lindberg, No. 1:09– CV–01362, 2012 WL 1642466 (M.D.Pa. May 10, 2012);  Picozzi v. Haulderman, No. 4:08–CV–0926, 2011 WL 830331, at *5 (M.D.Pa. Mar. 3, 2011) (finding that plaintiff failed to establish an excessive use of force claim where record establishes that the force used, pepper spray, was necessary and the minimum amount needed to get the plaintiff to an area where she could be medically treated); Soto v. Dickey, 744 F.2d at 1270 (finding that the use of mace, tear gas or other chemical agent of the like nature, when reasonably necessary to subdue recalcitrant prisoners, does not constitute cruel and inhuman punishment, even if the inmate is handcuffed).

In the matter *sub judice* plaintiff alleges that on February 5, 2012, his cellmate, Inmate Allison, had come "unhinged" in that he had intentionally vomited in the cell, was violent,

threw lunch trays and refused to cooperate or comply with the orders given by corrections officers. Corrections officers attempted to resolve the situation for approximately an hour with no success. When the CERT arrived, "instead of opening the cell door and charging Inmate Allison with the shock shield, to cuff and shackle him to extract him from the cell. L.T. Ananea ordered them to discharge an entire can of (OC) spray into the cell . . . " (Doc. 3, at 13, ¶ 19.)

The events as described by plaintiff reveal that the use of force in the form of discharge of OC spray ordered by defendant Ananea was modest in scope, duration and intensity, and was used in a good-faith effort to restore discipline and order. Plaintiff clearly alleges that the force was utilized so as to quell Inmate Allison and was in no way directed at him. In fact, corrections officers instructed plaintiff to seek protection under the bottom bunk prior to the discharge of the OC spray. The complaint is devoid of allegations that would lead one to conclude that defendant Ananea ordered the discharge of OC spray in an attempt to maliciously or sadistically injure or punish plaintiff. Although exposure to the spray caused him to experience bronchial spasms, a lack of oxygen, and a severe burning sensation, he was removed from the cell within eight to nine minutes of the discharge of the spray, he received immediate medical treatment, was instructed to get in the shower, and was relocated to a clean cell.

Inasmuch as plaintiff takes issue with defendant Ananea's decision not to remove him from the cell prior to discharging the OC spray, we must bear in mind that "a prison's

12

internal security is peculiarly a matter [for] the discretion of prison administrators." Whitley v. Albers, 475 U.S. 312, 321 (1986) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 n. 14(1981)).  Prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  Id. at 321–22 (quoting Bell, 441 at 547.  As a general rule, judges should not second guess decisions made by prison administrators faced with disturbances or other emergencies affecting prison security.  Id. at 322.  "The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect  that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."  Whitley, 475 U.S. at 319.  In light of courts' "hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance," a prisoner alleging that an officer used excessive force cannot merely question "the reasonableness of a particular use of force or the existence of arguably superior alternatives."  Whitley, 475 U.S. at 319, 322.  Plaintiff is clearly questioning the reasonableness of the force used in light of what he perceives to have been a superior alternative to the discharge of OC spray, i.e., opening the cell door and rushing Inmate Allison with riot gear.  This Court will not second guess the decision made by defendant Ananea as it is clear from the allegations of the complaint that action was taken in the context of a prison disturbance that threatened prison security.

13

Based on the foregoing, the excessive use of force claim lodged against defendant Ananea will be dismissed.

## C.     Failure to Protect

Plaintiff alleges that defendants Henry and Mendez violated his due process rights by failing to protect him from the June 30, 2012 assault by Inmate Williams. The following has been stated by the Third Circuit with respect to the applicable standard of review:

> While we have not previously addressed the standard governing a pretrial detainee's failure-to-protect claim, we have stated in dicta that the state of mind requirement for prisoners' claims—"deliberate indifference"—applies also to pretrial detainees' claims. See Colburn v. Upper Darby Twp., 946 F.2d 1017, 1024 (3d Cir. 1991). It is well established that merely negligent misconduct will not give rise to a claim under § 1983; the state defendant must act with a higher degree of intent. See, e.g., County of Sacramento v. Lewis, 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). In assessing where on the state-of-mind continuum misconduct must fall to establish a § 1983 claim, we have settled on "deliberate indifference" both in cases involving prisoners, see, e.g., Hamilton, 117 F.3d at 746 (failure to protect), and pretrial detainees, see Colburn, 946 F.2d at 1024 (detainee suicide). We have similarly adopted that standard when addressing, through a due process prism, a sentenced prisoner's failure-to-protect claim. See Davidson, 752 F.2d at 828. We discern no basis to apply a different standard here.

> This standard is consistent with the dictates of Bell. There, the Supreme Court emphasized that pretrial detainees must be free from "punishment." 441 U.S. at 537, 99 S.Ct. 1861. As the Supreme Court has since stressed, "[i]f the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." Wilson v. Seiter, 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); see also id. (explaining that "if a guard accidentally stepped on a prisoner's toe and broke it, this would not be punishment in anything remotely like the accepted meaning of the word" (internal alterations, quotation marks omitted)). The Court in Bell did not explicate the requisite mental element, presumably because the challenged actions—for instance, the correctional

14

> facility's replacing the single bunks in many cells with double bunks—were unquestionably performed intentionally. However, in cases like this one, where pretrial detainees attack not the "general conditions, practices, rules, or restrictions of pretrial confinement," but instead "a jail official's episodic acts or omissions," Hare v. City of Corinth, 74 F.3d 633, 643 (5th Cir.1996) (en banc), the official's mental state requires further consideration.
>
> Accordingly, we conclude that a pretrial detainee presenting a failure-to-protect claim must plead that the prison official acted with deliberate indifference to the detainee's health or safety. This conclusion is consistent with the holdings of numerous of our sister circuits. See, e.g., Caiozzo v. Koreman, 581 F.3d 63, 71 (2d Cir. 2009); Tesch v. County of Green Lake, 157 F.3d 465, 475 (7th Cir. 1998); Hare, 74 F.3d at 645.

Burton v. Kindle, 401 F. App'x 635, 637-638 (3d Cir. 2010). Plaintiff fails to allege that either defendant Henry or Mendez acted with deliberate indifference. Neither defendant was informed that Brooks feared that he would be attacked by Inmate Williams and Brooks fails to allege that the defendants were independently aware that Williams posed a threat to him or was generally prone to violence. To the contrary, Brooks alleges that this was essentially a random attack. Although he alleges that Mendez witnessed the intimidation, harassment and taunting he was experiencing from the inmates on his cell block, he never advised any prison official of a problem with Inmate Williams; nor did he ever submit a complaint about Williams. Moreover, the response to Brooks' grievance, which he attaches to his complaint, states that the grievance officer's review of the video of June 30, 2012, revealed that Brooks had argued with Inmate Williams and motioned for him to go to the laundry room where the correctional officer could not witness the fight. (Doc. 3, at 39.) Brooks has failed to state a claim that defendants acted with deliberate indifference. The motion to dismiss will be

15

granted as to this claim.

### 3.     Deliberate Indifference to Medical Conditions

In previous cases, the United States Court of Appeals for the Third Circuit has applied

the standard  pertaining to prisoners' claims of inadequate medical care under the Eighth

Amendment set forth in Estelle v. Gamble, 429 U.S. 97 (1976), when evaluating whether a

claim for inadequate medical care by a pre-trial detainee is sufficient under the Fourteenth

Amendment.  See Sylvester v. City of Newark, 120 F. App'x 419, 423 (3d Cir. 2005), citing

Natale v. Camden Cnty Corr Facility, 318 F.3d 575, 581 (3d Cir. 2003)).  The Eighth

Amendment standard, set forth in Estelle, is whether there exists evidence of a serious

medical need and acts or omissions by prison officials indicating deliberate indifference to

that need.  Id. at 582.  Deliberate indifference requires that prison officials know of an

excessive risk to an inmate's health or safety and affirmatively disregard that risk.  Farmer v.

Brennan, 511 U.S. 825, 835, 837-38 (1994).  Absent a belief or actual knowledge that

medical personnel mistreated or failed to treat a prisoner, the non-medical defendants cannot

be charged with the Eighth Amendment scienter requirement of deliberate indifference.

Spruill, 372 F.3d at 236.

Brooks has failed to show that his care was inadequate under any relevant standard.

With respect to the June 5, 2012 incident, he received medical attention immediately upon

being removed from his cell.  He was instructed to take a hot shower to remove the OC spray

and to inhale the steam to assist in clearing his lungs.  Although he alleges that nurse Fromm

failed to provide him with a breathing treatment or his inhaler later that same evening, he fails to allege that defendants had a belief or actual knowledge that Fromm refused him treatment. Further, he alleges that he "was seen by the Psych Doctor here at Centre County Correctional Facility, and she understood my severe anxiety, nightmares, and post traumatic stress syndrome, due to near death experience when I was subjected to a whole can of (OC) spray in my cell, in which I suffer Asthma. The Psych Doctor prescribed me Remeron to be taken at night before bed, this helped somewhat." (Id. at ¶ 5(a).) When it was discovered that the Remeron increased his hypertension and cholesterol levels, he was advised to discontinue taking the medication. (Id. at ¶ 5(b).)

As concerns the medical treatment he received following the June 30, 2012 assault, he indicates that he was given Midol twice a day for five days.[2] His nose was x-rayed and it was concluded that his nose was not broken. (Doc. 3, 35, ¶ 4(a).) On July 13, 2012, he sought further medical treatment because the cartilage was dislodged, blocking his right nostril and preventing him from breathing or blowing his nose out of that side. (Id. at 38, ¶¶ 1-2.) He was examined by a physician's assistant who concluded that the cartilage was out of place and referred him to an outside specialist. (Id. at 38, ¶ 2.) On July 18, 2012, he was seen by Dr. Burwell who did not observe any abnormalities with the physical structure of plaintiff's nose. (Id. at ¶¶ 3-4.) However, because plaintiff had swollen sinus membranes, the doctor

---

[2]Plaintiff may be mistaken in identifying the medication he received as Midol, as it is a Bayer product prescribed to alleviate menstrual symptoms. See www.midol.com.

concluded that he was suffering from allergies and prescribed nasal spray to reduce the swelling.  (Id. at ¶ 4.)

It is clear from the allegations that, on both occasions, Brooks received medical treatment, but disagreed with the course of treatment.  This does not state a viable claim for relief.  Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) ("mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation).  Thus, Brooks's deliberate indifference to serious medical needs claims are properly dismissed.

## IV.   Conclusion

Based on the foregoing, defendants' motion (Doc. 8) to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) will be granted.[3]

An appropriate order will issue.

BY THE COURT:

s/James M. Munley
JUDGE JAMES M. MUNLEY
United States District Court

Dated:   May 13, 2014

---

[3]Because plaintiff is unable to cure the deficiencies of the complaint, affording him an opportunity to amend would be futile.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 110–111 (3d Cir. 2002) (finding that a court should not dismiss a complaint with prejudice for failure to state a claim without granting leave to amend, unless it finds bad faith, undue delay, prejudice or futility).